IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Caleb James Quincy Streight, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:21-cv-50339 |
| v. | ) | |
| | ) | Judge Iain D. Johnston |
| | ) | |
| Jay Robert Pritzker, Rock Valley College, | ) | Magistrate Judge Lisa A. Jensen |
| Howard J. Spearman, and Illinois Board of | ) | |
| Higher Education,[1] | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Pro se plaintiff Caleb Streight, a full-time student at Rock Valley College (RVC) in Rockford, Illinois, seeks a preliminary injunction against the COVID-19 testing requirement at RVC for unvaccinated students. Dkt. 12. For the reasons herein, Streight's motion for a preliminary injunction is denied because he has failed to show the likelihood of success on the merits of his claim.

## BACKGROUND

On August 23, 2021, the Food and Drug Administration (FDA) granted full approval to the Pfizer-BioNTech COVID-19 Vaccine. FDA News Release, "FDA Approves First COVID-19 Vaccine," https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine (Aug. 23, 2021) (last visited Sept. 22, 2021). On August 26, 2021, Illinois Governor J.B. Pritzker signed Executive Order 2021-20, which imposed minimum vaccination requirements for

---

[1] The Court clarified with the parties during the status hearing held September 17, 2021, that the intended and proper defendant is the Illinois Board of Higher Education, rather than the Illinois Board of Education. The clerk is directed to make that correction on the docket.

1

higher education. Exec. Order No. 2021-20, 45 Ill. Reg. 11429 (Sep. 10, 2021) (hereinafter as "EO20"). Specifically, the order requires that faculty, staff, and students at institutions of higher education (IHEs), including community colleges, receive at least one dose of a COVID-19 vaccine by September 5, 2021 and provide proof of full vaccination within 30 days.[2] The order established a minimum weekly testing protocol for anyone who is not vaccinated, and states that each IHE "shall exclude . . . students . . . unless they comply with the testing requirements." *Id.* The order allows for two narrow exceptions: 1) when the vaccine is medically contraindicated, and 2) when vaccination would violate an individual's religion. *Id.* Streight does not allege that either exception applies to him.

On August 26, RVC President Spearman sent an email to RVC students explaining that it planned to comply with the Governor's order EO22. Dkt. 36, at 4. Spearman stated that RVC's "main goal is to prevent the spread of COVID-19 and to maintain safe, in-person operations." *Id.* His email also indicated that specific details about how RVC would implement the testing and self-reporting program would be updated on the school's website at www.rockvalleycollege.edu/COVID. *Id.*

On August 27, 2021, RVC President Spearman sent another email to RVC students, reiterating that the school would require vaccines for individuals enrolled in on-campus courses and require masks and weekly testing for anyone who was exempt or refused the vaccine. Dkt. 12, at 7-8. As a result, COVID testing of students is only required when a student is not only unvaccinated but also attends classes in-person. This email also encouraged students and

---

[2] On September 3, 2021, Gov. Pritzker issued Executive Order 2021-22, which extends the timeframe for individuals to comply with the testing or vaccine mandate. Students at IHEs are required to have their first dose of a vaccine by September 19, 2021, and show proof of full vaccination within 30 days. Exec. Order No. 2021-20, 45 Ill. Reg. 11639 (Sep. 17, 2021) (hereinafter as "EO22"). Streight did not amend his complaint to reflect the updated EO or its deadlines, but this Court will presume the challenged state action to be EO22, as it has superseded EO20.

employees to get vaccinated and to make use of the free SHIELD COVID-19 Testing Site on campus at the Educational Resource Center building.

SHIELD Illinois COVID-19 Testing is "surveillance testing" that "can be useful in finding asymptomatic and pre-symptomatic cases" of COVID-19. RVC, "SHIELD Testing," www.rockvalleycollege.edu/COVID/SHIELD-Testing.cfm (last visited Sept. 21, 2021). SHIELD Tests are PCR-based tests requiring only a small test tube of saliva. *Id.* RVC explains that "life continues as usual while waiting for the [test] results" and that students need not wait for a negative test to be on campus. *Id.* Further, testing is available at RVC's main campus four days a week: from 8 a.m. to 5 p.m. on Mondays and Wednesdays, and 12 p.m. to 5 p.m. on Tuesdays and Thursdays. *Id.* RVC also states, "As we return to campus, ensuring the health and safety of our campus community is of utmost importance. Routine testing can help us identify infected but asymptomatic individuals and . . . help stop the transmission of COVID-19 by catching early infections." *Id.*

On September 1, 2021, Plaintiff Caleb Streight filed a pro se motion for an emergency injunction seeking to bar RVC from requiring him to submit to weekly COVID testing. Streight alleges that the mandatory COVID testing regimen at RVC is an unreasonable search under the Fourth Amendment.[3]

### FINDINGS OF FACT

This Court held an evidentiary hearing on September 21, 2021 on Streight's motion for a preliminary injunction and permitted each side to call witnesses and submit affidavits. Only a limited record was presented to the Court. At the hearing, Streight presented twelve exhibits

---

[3] The complaint seeks relief for himself and all others similarly situated, but the Court has already explained to Streight that he may not represent a class pro se. *See* Dkt. 10.

including documents from the Centers for Disease Control and Prevention (CDC) about COVID-19 mortality, from the Vaccine Adverse Event Reporting System (VAERS) about the COVID vaccines, and several cases. He testified that he was in "imminent danger of being harmed by the government" because the testing requirement violates his "Fourth Amendment right to be secure in [his] person and the right to be free from unreasonable searches and seizures." Prelim. Inj. Hr'g Tr. 12:16 – 20:13. Streight also testified that he was "in peril of being removed from public education system for standing on [his] Fourth Amendment right."[4] *Id.* The Court confirmed with Streight that his claim was based on the Fourth Amendment.

Streight testified to the following facts at the hearing.[5] Streight currently resides in Belvidere, Illinois, and is twenty years old. He took two years off after attending Sycamore High School in Sycamore, Illinois, and first enrolled in courses at RVC for the Fall 2021 term. He is majoring in Philosophy and would like to attend law school in the future. This semester, his first semester at RVC, he is enrolled in five, three-credit-hour general education courses for a total of fifteen hours. He attends these courses in person, Monday through Thursday. He has not attended courses remotely at RVC or during high school, though he does have a laptop or computer at home that he could use for remote learning. During the past two years, he worked jobs at several factories in the region. He is not currently vaccinated and has never taken a COVID test, either nasal or saliva. He stated that he had taken a saliva-based test once in the past as a drug test, and testified that he had received the required vaccines for elementary through high school. He was

---

[4] To the extent that Streight considers himself harmed by the delay or denial of access to a college education at RVC, that harm is not irreparable. *See Klaassen v. Trs. of Ind. Univ.*, No. 21 CV 238 DRL, 2021 U.S. Dist. LEXIS 133300, *114 (collecting cases). "Wearing masks, undergoing surveillance testing and social distancing also aren't indicative of irreparable harm, but consistent with CDC guidelines." *Id.* at *115.

[5] These facts are taken from the Preliminary Injunction Hearing on Sept. 21, 2021. *See* Prelim. Inj. Hr'g Tr., Sept. 21, 2021.

unaware of any adverse reactions to these vaccinations. Streight also testified that he was aware that RVC's policy allows him to get a COVID-19 vaccine or take classes online to avoid the testing requirement.

RVC submitted an Affidavit from President Spearman, which included three emails from Spearman to the RVC student body about the school's COVID Response. Dkt. 36. The Illinois Board of Higher Education (IBHE) and Gov. Pritzker submitted an affidavit from Dr. Susan Casey Bleasdale, who is an Associate Professor of Clinical Medicine at University of Illinois and serves as a consultant to the Illinois Department of Public Health (IDPH) on the state's COVID-19 response. Dkt. 34-1, ¶¶ 1-4.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy." *Tully v. Okeson*, 977 F.3d 608, 612 (7th Cir. 2020) (quoting *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017)). A party seeking a preliminary injunction must establish two preliminary elements: "(1) some likelihood of succeeding on the merits, and (2) that it has no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied." *Cassell v. Snyders*, 990 F.3d 539, 544-45 (7th Cir. 2021) (internal citations omitted). If the party seeking the injunction can satisfy those threshold factors, the court must then consider two additional elements: "(3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Id.* at 545 (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992)).

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat'l Resource Defense Council*, 555 U.S. 7, 24 (2008) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). A preliminary injunction is a powerful tool of law, "never to be indulged in except in a case clearly demanding it." *Cassell*, 990 F.3d at 544 (quoting *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020)). In the process, the Court is not bound by strict rules of evidence at a preliminary injunction hearing. *See, e.g.*, *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997); *Park Ridge Sports, Inc. v. Park Ridge Travel Falcons*, No. 20-CV-2244, 2020 U.S. Dist. LEXIS 200094, *4 (N.D. Ill. Aug. 20, 2020); *Rice v. Sapphire*, No. 14 C 08675, 2014 U.S. Dist. LEXIS 203946, *6 n.3 (N.D. Ill. Nov. 24, 2014); *Baker v. Int'l Union of Operating Engineers, Local 150, AFL-CIO*, 641 F. Supp. 2d 698, 700 n.1 (N.D. Ill. 2009); *In re Roberts*, 607 B.R. 635, 647-48 (Bankr. N.D. Ill. 2019) (collecting cases); *Houdini Inc. v. Goody Baskets LLC*, 166 F. App'x 946, 947 (9th Cir. 2006) ("the rules of evidence do not strictly apply to preliminary injunction proceedings"). So, affidavits and declarations may be admitted into evidence. *Hunter v. Atchison, T. & S.F. Ry. Co.*, 188 F.2d 294, 298 (7th Cir. 1951).

"The Federal Rules of Evidence permit a court to take judicial notice of a fact that is 'not subject to reasonable dispute' because it is 'generally known' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *United States v. De La Torre*, 940 F.3d 938, 952 (7th Cir. 2019) (quoting Fed. R. Evid. 201(b)). Courts may take judicial notice of official publications on government websites. *Qiu Yun Chen v. Holder*, 715 F.3d 207, 212 (7th Cir. 2013); *Denius v. Dunlap*, 330 F.3d 919, 926-27 (7th Cir. 2003).

**ANALYSIS**

Here, the Court is presented with an issue of "unique constitutional nature," as few courts have addressed a Fourth Amendment challenge (which, again, is the sole challenge) to a college's COVID testing mandate. *Klaassen v. Trs. of Ind. Univ.*, No. 21 CV 238 DRL, 2021 U.S. Dist. LEXIS 133300, *38 (N.D. Ind. Jul. 18, 2021). The court focuses first on the likelihood of success on the merits because that factor is dispositive of the motion.

### A. Likelihood of Success on the Merits

To obtain a preliminary injunction, a movant has a burden to make a "strong showing" that he is likely to succeed on the merits. *Tully*, 977 F.3d at 613. This "normally includes a demonstration of how the applicant proposes to prove the key elements of [his] case." *Ill. Rep. Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). The Seventh Circuit uses a "sliding scale" approach to determine whether a movant has shown some likelihood of success on the merits. *Mays v. Dart*, 974 F.3d 810, 820 (7th Cir. 2020) (explaining how "likely" is a higher standard than "better than negligible" or "possible" in this context); *Ty, Inc. v. Jones Group Inc.*, 237 F.3d 891, 895 (7th Cir. 2001) ("This process involves engaging in what we term the sliding scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position.").

Fourth Amendment Unreasonable Search

Here, Streight alleges a violation of a specific constitutional right found in the Fourth Amendment, so his claim "must be analyzed under the standard appropriate to that specific provision." *County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998). The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "Only government activity that

constitutes either a 'search' or a 'seizure' is regulated by the Fourth Amendment." *Christensen v. Cty. of Boone*, 483 F.3d 454, 459 (7th Cir. 2007). And the Fourth Amendment's provision protects against only *unreasonable* searches and seizures. *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). Streight alleges that RVC's testing mandate is an unreasonable search of his person. "When an alleged search is not performed as part of a criminal investigation, the Court may 'turn immediately to an assessment of whether [the search is] reasonable.'" *Gutterman v. Ind. Univ.*, No. 1:20-cv-02801-JMS-MJD, 2021 U.S. Dist. LEXIS 165841, *18 (S.D. Ind. Sep. 1, 2021) (dismissing a complaint on a 12(b)(6) motion because the search and seizure was reasonable) (quoting *Naperville Smart Meter Awareness v. City of Naperville*, 900 F.3d 521, 528 (7th Cir. 2018)). The Court assumes—without deciding—that the testing at issue is a search, and turns to the question of whether the search is reasonable.

"At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Naperville Smart Meter*, 900 F.3d at 525 (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). However, when there is intrusion on an individual's privacy in the form of a warrantless search or seizure, courts assess the reasonableness "by balancing [the allegedly unconstitutional conduct's] intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests." *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 187-88 (2004) (internal citations omitted). "Indeed, '[t]he touchstone of the Fourth Amendment is reasonableness.'" *Naperville Smart Meter*, 900 F.3d at 528 (quoting *Jimeno*, 500 U.S. at 250).

Although suspicionless searches are generally prohibited by the Fourth Amendment, an exception exists in certain circumstances where the government has "special needs, beyond the normal need for law enforcement." *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (quoting *New*

8

*Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985)). Fourth Amendment violations unrelated to law enforcement are analyzed under a special-needs analysis. *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995) (applying special needs analysis to random drug testing of students in public schools). "A search unsupported by probable cause can be constitutional . . . 'when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" *Id.* (quoting *Griffin*, 483 U.S. at 873). A Fourth Amendment special-needs analysis requires a court to consider at least these factors:

> (1) the nature of the privacy interest affected,
> (2) the character of the intrusion,
> (3) the nature and immediacy of the government concern, and
> (4) the efficacy of this means of addressing the concern.

*Vernonia*, 515 U.S. at 654-64.

Here, Streight claims the COVID testing program required to attend in-person classes at RVC is a violation of his Fourth Amendment right to be free from unreasonable searches and seizures. As to the nature of the privacy interest, it is well-settled that "the collection and testing of [bodily fluids] intrudes upon expectations of privacy that society has long recognized as reasonable." *Skinner v. Railway Labor Execs.' Ass'n*, 489 U.S. 602, 617 (1989); *Chandler v. Miller*, 520 U.S. 305, 313 (1997)[6]; *see also Barrett v. Claycomb*, 976 F. Supp. 2d 1104, 1114

---

[6] Streight relied on *Chandler v. Miller* for the proposition that the government cannot require suspicionless drug testing. But he misreads that holding. *Chandler* acknowledged the "special needs" exception to suspicionless (also called warrantless) searches, and found that Georgia's law requiring drug testing of political candidates did not satisfy the special needs analysis. *Id.* at 313-14 ("When such 'special needs'—concerns other than crime detection—are alleged in justification of a Fourth Amendment intrusion, courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties. In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion.") (cleaned up). If anything, *Chandler* supports this Court's analysis. Georgia's provision was struck down because there was no evidence of a drug problem sufficient to justify the suspicionless testing. Here, there is evidence of COVID infections, hospitalizations, and deaths.

(W.D. Mo. 2013), *aff'd in part, rev'd in part, vacated in part, and appeal dismissed in part sub nom., Kittle-Aikeley v. Strong*, 844 F.3d 727 (8th Cir. 2016) (en banc).[7] Streight's Fourth Amendment right is implicated by the taking of saliva for a COVID test. And the Seventh Circuit has long recognized this type of privacy interest. *See, e.g.*, *Dimeo v. Griffin*, 943 F.2d 679, 682 (7th Cir. 1991) (finding the invasion of privacy caused by giving a urine sample slight for anyone who undergoes annual medical exams). When one voluntarily undertakes a job or enrolls in a college or university, he "*voluntarily* trades away some of his privacy for other goods"—here, access to on-campus resources. *Id.* at 683.

As to the character of the intrusion, Streight has voluntarily enrolled in in-person courses at RVC for the Fall 2021 semester. He testified that he was aware he could take his courses online at RVC to avoid the testing requirement and that he owned a laptop or other computer device that he could use for this purpose. Prelim. Inj. Hr'g Tr. 18:15-17, 16:10-12. Streight also testified that he was aware he could be vaccinated to avoid the testing requirement and continue taking in-person courses at RVC. *Id.* at 18:18-21. And RVC is incentivizing fully-vaccinated students with a $100 check. Dkt. 36, at 4. Thus, the nature of the privacy interest affected by RVC's testing requirement is minimal. There are alternatives available to avoid testing—namely, vaccination or enrollment in online course. And Streight also has the ultimate alternative: attend a college that does not impose a testing requirement.

Further, the requirement for weekly, no-cost, saliva-based testing is also negligible. RVC requires unvaccinated students attending in-person courses to submit to COVID testing once a week, available free of charge at an on-campus SHIELD testing site. The saliva PCR test is one

---

[7] Streight relied on *Barrett v. Claycomb* for the proposition that it found suspicionless drug testing in a school setting to be unreasonable and unconstitutional. That is not the full holding. *Barrett* applied a context-specific analysis to each program of study at the university. Regardless, this is an Eighth Circuit case, which is instructive, but not precedential to this Court's decision in the Northern District of Illinois.

of the most minimally-invasive tests available, as it only requires a small vial of saliva and can be completed in a public setting, unlike blood or urine tests. To be blunt, the SHIELD test is simply spitting—technically, drooling— into a tube. Further, Spearman explained to students that RVC was using Qualtrics, encrypted software that meets Health Insurance Portability and Accountability Act (HIPAA) and Personal Health Information (PHI) privacy requirements, for self-reported testing and vaccine documents. Dkt. 36, at 5. So, to the extent that the intrusion is health-related, RVC has shown it is taking reasonable precautions regarding the privacy of student health data.

The nature and immediacy of the government concern here is great. Gov. Pritzker's EO22 was based on several factors important to the health and safety of the residents of Illinois, including, but not limited to these: rising numbers of COVID-19 cases and hospitalizations throughout all regions of the state; CDC guidance as to the dominant, aggressive, and highly-transmissible Delta variant strain of COVID-19; safety, efficacy, and availability of the COVID-19 vaccine; and the significant percentage of the population that remains unvaccinated. EO22; *see also* Dkt. 34-1, ¶¶ 17-25. Further, the government's concern is indeed immediate. The CDC estimates that the aggressive Delta variant now accounts for more than ninety percent of all sequenced COVID-19 cases throughout the country, and the IDPH has determined that the Delta variant is spreading quickly among unvaccinated people of all ages in Illinois. *Id.*

Streight challenged the state's concern with several exhibits and data points, some of which conflict with one another. He presented a document from the CDC identifying low death rates among the "under 45" age group (Dkt. 37) and high rates of death in the "over 45" age group (Dkt. 37-6), but made no showing to link those age groups to himself or the others at RVC. Streight also presented documents from the CDC concerning comorbidities and COVID-19. One

document showed that COVID-19 was the "underlying cause of death" in ninety-two percent of cases. Dkt. 37-2. Another stated that ninety-five percent of all COVID deaths had comorbidities on their death certificates. Dkt. 37. Yet another document stated that there was an average of four additional causes of death in each COVID death and that COVID-19 was the "only cause" in merely five percent of cases. Dkt. 37-1. Although the Court does not question the accuracy of these statistics, Streight is taking the data out of context. A comorbidity is "a concomitant but unrelated pathologic or disease process; usually used in epidemiology to indicate the coexistence of two or more disease processes." *Stedman's Medical Dictionary* (ed. 24). The CDC's Technical Notes state that the World Health Organization (WHO), along with the International Statistical Classification of Diseases and Related Health Problems (ICD), provides the framework and coding that most countries around the world use to classify causes of death. Dkt. 37-2, at 1-2 ("It provides not only disease, injury, and poisoning categories but also the rules used to select the single underlying cause of death for tabulation from the several diagnoses that may be reported on a single death certificate."). Although comorbidities are, no doubt, important to understanding how the virus interacts with the human body, Streight appears to confuse comorbidities with underlying causes of death.

Additionally, Streight relies on a CDC document titled "Delta Variant: What We Know About the Science" for the proposition that with the Delta variant of COVID, similar amounts of "viral genetic material" are found among both vaccinated and unvaccinated individuals. Dkt. 37-7, at 1. However, Streight again fails to read this in context. Immediately following, the document provides a qualification: "However, like prior variants, the amount of viral genetic material may go down faster in fully vaccinated people when compared to unvaccinated people. This means fully vaccinated people will likely spread the virus for less time than unvaccinated

people." *Id.* This document also states that "vaccination is the best way to protect yourself, your family, and your community," and that in addition to vaccination, "layered prevention strategies, including wearing masks, are needed to reduce transmission of this variant." *Id.* at 2. Even a pro se litigant should know not to selectively quote data from an exhibit that benefits one's own position but neglect to present to the court the contrary information. Indeed, that is why the law recognizes the "rule of completeness." Fed. R. Evid. 106.

Finally, regarding the efficacy of this means of addressing the concern for public health and safety, Gov. Pritzker has chosen to address this public health concern by issuing EO22, requiring all students at IHEs to be vaccinated, or in the alternative, to submit to weekly COVID testing. States have broad regulatory and administrative authority with regard to public health measures. Indeed, even a case that Streight cites recognizes this proposition. *See, e.g.*, *People v. Adams*, 597 N.E.2d 574, 579 (1992) ("Like other measures intended to enhance public health and community well-being, governmental action designed to control the spread of disease falls within the scope of the State's police powers. Traditionally, the States have been allowed broad discretion in the formulation of measures designed to protect and promote public health.").[8]

Streight introduced evidence and argued against vaccines. But vaccinations are not really relevant to Streight's Fourth Amendment claim. His claim is based on the SHIELD testing, not vaccination. He is not being forced to vaccinate. Instead, he is required to submit to SHIELD testing because he is unvaccinated and seeks to attend in-person classes. But even if Streight's

---

[8] Streight relied on *Adams* for the proposition that the state could only compel drug testing in "extraordinary circumstances," such as being convicted of a crime. But in fact, *Adams* cuts the other way. In *Adams*, persons convicted of a crime were forced to submit to blood testing for HIV. *Id.* The Illinois Supreme Court found that this was a "minimally intrusive" test, that it was within the state's broad police powers to require the test, and that convicted persons have a lesser expectation of privacy than the average adult. RVC's testing program is less invasive (saliva, not blood), and generally, students have lesser expectations of privacy on-campus than average adults. This case does not help Streight.

13

focus on vaccination were relevant, he's wrong on the facts. Indeed, the Court is dumbfounded that it even must engage in this discussion. Operation Warp Speed's results should be celebrated. Vaccines to reduce the spread and severity of COVID 19 were developed in record time. That is a tremendous victory for humanity. And *real* data show that these vaccines, like so many others before, are generally safe and effective.[9] As a general matter, Streight's own history of taking vaccines without any demonstrable adverse consequences bolsters this point. The Seventh Circuit, holding that Indiana University's vaccine mandate was not unconstitutional and denying a motion for an injunction pending appeal, highlighted the effectiveness of vaccines in furthering public health, safety, and welfare:

> Each university may decide what is necessary to keep other students safe in a congregate setting. Health exams and vaccinations against other diseases (measles, mumps, rubella, diphtheria, tetanus, pertussis, varicella, meningitis, influenza, and more) are common requirements of higher education. Vaccination protects not only the vaccinated persons but also those who come in contact with them, and at a university close contact is inevitable. . . . A university will have trouble operating when each student fears that everyone else may be spreading disease.

*Klaassen*, 7 F.4th at 593-94 (finding mandatory vaccination or weekly testing a reasonable condition of enrollment at a university). As discussed above, RVC's policy gives students options; if they do not wish to submit to vaccination or weekly testing, they may opt to take their courses online from the privacy and safety of their homes. Though the SHEILD testing requirement itself is an effective means of addressing the concern, RVC's policy goes above and

---

[9] Streight cites to VAERS data showing numbers of reported hospitalizations (Dkt. 37-5), permanent disablement (Dkt. 37-4), and deaths (Dkt. 37-3) after receiving a COVID-19 vaccine. Again, Streight is reading this data out of context. The website itself cautions that "VAERS reports alone cannot be used to determine if a vaccine caused or contributed to an adverse event or illness. The reports may contain information that is incomplete, inaccurate, coincidental, or unverifiable. . . . The number of reports alone cannot be interpreted or used to reach conclusions about the existence, severity, or frequency, or rates of problems associated with vaccines." While these reports were admitted for the purposes of the Preliminary Injunction Hearing, they must be placed in context and read as a whole. Cherry-picking facts from a document is bad advocacy, even for a pro se litigant, especially one that hopes to become an attorney.

beyond. Students who refuse to submit to the SHEILD testing are not denied access to an education at RVC, they are able to attend courses online.

## CONCLUSION

Because the Court determines that Streight has not met his burden to make a strong showing of the likelihood of success on the merits, the analysis need go no further. For the reasons stated above, Streight's motion for a preliminary injunction is denied.

Date:  September 22, 2021    By: _____
                                 IAIN D. JOHNSTON
                                 United States District Judge